# In the United States Court of Federal Claims

Nos. 14-332C, 14-333C, 14-334C, 14-335C
(Filed: February 28, 2018)

* * * * * * * * * * * * * * * * * * * * * * * *

CALLAWAY MANOR APARTMENTS,
LTD, et al.,

                *Plaintiffs*,

v.

THE UNITED STATES,

                *Defendant*.

* * * * * * * * * * * * * * * * * * * * * * * *

Contracts; takings; 42 U.S.C. §§ 1485, 1490a; effect of assignment clause; standing to bring breach of contract claim.

*Jeff H. Eckland,* Minneapolis, MN, with whom was *Mark J. Blando*, for plaintiffs.

*Geoffrey M. Long*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for defendant.

OPINION

BRUGGINK, *Judge*.

This is an action for breach of contract, or, in the alternative, for a Fifth Amendment taking arising from the government's repudiation of the prepayment provision of loan agreements made under sections 515 and 521 of the Housing Act of 1949, 42 U.S.C. §§ 1485, 1490a (2012). Pending before the court is defendant's motion for summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims, filed on February 21, 2017, as a motion to dismiss and converted by the court to a motion for summary judgment on August 8, 2017. The motion is fully briefed, and we held oral argument on February 9, 2018. Because plaintiffs assigned their contract rights to the government and the takings claim also arises out of those same contracts with the government, we grant defendant's motion for

summary judgment.

BACKGROUND[1]

The Farmers Home Administration ("FmHA") of the United States Department of Agriculture ("USDA") issued plaintiffs mortgage loans in exchange for plaintiffs providing housing for low-income tenants during the life of the loan under section 515 of the Housing Act of 1949, 42 U.S.C. §§ 1485, 1490a. FmHA required plaintiffs, Callaway Manor Apartments Limited Partnership ("Callaway Manor"), Fox Garden Apartments Limited Partnership ("Fox Garden"), Fox Manor Apartments Limited Partnership ("Fox Manor"), and Lake Garden Apartments Limited Partnership ("Lake Garden"), to use their property in accordance with the section 515 program for twenty years. After the restrictive use period, plaintiffs would be free to prepay their mortgages, releasing their property from the restrictive use covenants. The following background describes the relevant provisions of the loan obligations entered into by the four plaintiffs and the United States.

*Callaway Manor Apartments, Ltd.*

Callaway Manor and FmHA entered into a loan agreement on May 18, 1984, for the construction of a low-income rental housing complex. The parties contemporaneously executed three documents: a loan agreement, promissory note, and mortgage.[2] FmHA was a party to each of the three documents.

The loan agreement recited that FmHA would provide a loan in exchange for Callaway Manor abiding by certain restrictions on its use of the property under section 515 of the Housing Act of 1949. The loan agreement incorporated both the promissory note and the mortgage, stating that "[t]he indebtedness and other obligations of the Partnership under the note

---

[1] These facts are drawn from defendant's proposed findings of fact and plaintiffs' responses to those proposed findings of fact. Although plaintiffs dispute some of defendant's proposed findings, we are satisfied that the disputed facts do not preclude summary judgment.

[2] The terms of the loan agreements, promissory notes, and mortgages are identical among the four properties.

evidencing the loan, the related security instrument and related agreement are herein called the 'loan obligation'." Def.'s App. 1.

FmHA also issued a 50-year term promissory note and mortgage to Callaway Manor. The promissory note recited the amount of the debt and terms of payment. It provided that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." *Id.* at 10. The mortgage included the additional use restriction that required the property to be used as low-income housing for twenty years, which imposed a restriction on the ability to prepay and exit the Section 515 program prior to the end of the twenty-year period. *Id.* at 8 (Mortgage Ex. A cl. 27). The mortgage expressly referenced the note it secured in several sections, providing that the "Borrower is justly indebted to the Government as evidenced by one or more certain promissory note(s) . . . . And it is the purpose and intent of this instrument that . . . this instrument shall secure payment of the note . . . ." *Id.* at 4. The mortgage expressly incorporated the loan agreement by reference, stating, "This instrument also secures the obligations and covenants of Borrower set forth in Borrower's Loan Agreement which is hereby incorporated herein by reference." *Id.* at 8 (Mortgage Ex. A cl. 26). Furthermore, the mortgage stated that the loan must be used in compliance with section 515 of Title V of the Housing Act of 1949 and is subject to the FmHA regulations.

*Fox Garden Apartments, Ltd.*

On January 21, 1983, Fox Garden and FmHA likewise executed a loan agreement, promissory note, and mortgage for the construction of a low-income rental housing complex. Fox Garden was subject to the requirements of section 515, as stated in the loan agreement and mortgage. FmHA issued Fox Garden a 50-year term mortgage and a promissory note. The loan agreement stated that the three documents together constituted the loan obligation, the mortgage incorporated the loan agreement by reference and referred to the promissory note, and the promissory note stated that the borrower could make prepayments of the scheduled installments at any time.

*Fox Manor Apartments, Ltd.*

Fox Manor and FmHA executed a loan agreement, promissory note, and mortgage on October 22, 1984, for the construction of a low-income rental housing complex. As with Callaway Manor and Fox Garden, Fox Manor was

subject to the requirements of section 515 in its operation of the apartment complex, as stated in the loan agreement and mortgage. FmHA issued Fox Manor a promissory note and mortgage with a 50-year term. The loan agreement stated that the three documents together constituted the loan obligation, the mortgage incorporated the loan agreement by reference and referred to the promissory note, and the promissory note stated that the borrower could make prepayments of the scheduled installments at any time.

*Lake Garden Apartments, Ltd.*

On February 24, 1984, Lake Garden executed a loan agreement, promissory note, and mortgage with  FmHA for the construction of a low-income rental housing complex. Lake Garden was subject to the requirements of section 515 in its operation of the apartment complex, as stated in the loan agreement and mortgage. FmHA also issued Lake Garden a promissory note and mortgage with a 50-year term. The loan agreement stated that the three documents together constituted the loan obligation, the mortgage incorporated the loan agreement by reference and referred to the promissory note, and the promissory note stated that the borrower could make prepayments of the scheduled installments at any time.

*Enactment of ELIHPA and HCDA*

Before the 20-year restrictive use period had expired, Congress enacted the Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, 101 Stat. 1877 (1988) ("ELIHPA") and the Housing and Community Development Act of 1992, Pub. L. No. 102-550, 106 Stat. 3672 (1992) ("HCDA"). ELIHPA and HCDA provide that the government would no longer automatically accept prepayment of the Section 515 program loans at the close of the 20-year restrictive use period, thereby repudiating the prepayment provision of the loan obligations. *Franconia Assocs. v. United States*, 536 U.S. 129, 142-43 (2002).

Instead of an unfettered right to prepay loan installments at any time after the restrictive use period ended, the statutes require USDA Rural Development, and its agency Rural Housing Service (the successor to FmHA), to respond to notices of intent to prepay by offering incentives to remain in the low-income housing program. 42 U.S.C. § 1472(c)(4)(A)-(B) (2012). Furthermore, if the borrower rejects the offered incentives, Rural Housing Service must require the borrower to attempt to sell the property at fair market

value to either a nonprofit organization or a public agency. *Id.* § 1472(c)(5)(A)(I). Only if the property does not sell within 180 days is the borrower free to prepay the loan. *Id.* § 1472(c)(5)(A)(ii).

*Properties Conveyed to Rural Development*

Each property's 20-year restrictive use period ended in 2003 or 2004. On February 28, 2008, Rural Development sent written notice to each plaintiff expressing concern about the economic viability of the properties. The twenty years in the Section 515 program saw the properties deteriorate. Def.'s App. 28-31 (Rural Development Feb. 28, 2008 Letter and Resp. To Rural Development Letter). The rents mandated by the Section 515 program were insufficient to pay for the required capital improvements and increased operating costs. *Id*. The properties had delinquent property taxes, deferred maintenance, and a high vacancy rate. *Id.*

Plaintiffs' response did not challenge RD's observations about the condition of the properties. As part of its response, the common general partner among plaintiffs sent a letter to Rural Development on March 18, 2008, stating that it intended to file prepayment requests for the four properties in order to exit the Section 515 program. Plaintiffs requested approval to prepay their respective promissory notes on April 28, 2008. The proposed deadline for prepayment was December 1, 2008.

As required by ELIHPA and HCDA, Rural Development offered plaintiffs various incentives to remain in the Section 515 program, but plaintiffs rejected the incentives. In 2009 and into 2010, plaintiffs marketed the properties to nonprofit organizations and public agencies for the required 180-day period. Although parties expressed interest in the properties, plaintiffs were unable to sell the properties.

With the statutory requirements satisfied, plaintiffs had the option to prepay the loans. Plaintiffs also retained the option to sue for breach of the contracts. *See Franconia*, 536 U.S. at 142-43. Plaintiffs did not renew their request to prepay the loans, however, nor did plaintiffs bring a claim for breach of contract at this time. Instead, in September 2010, plaintiffs requested that Rural Development allow plaintiffs to offer deeds in lieu of foreclosure.

In February 2011, Rural Development informed plaintiffs that their debt to the government would be accelerated. Plaintiffs each offered Rural

Development a deed in lieu of foreclosure on May 18, 2011. Rural Development accepted the offers in November 2011. Plaintiffs transferred the deeds to Rural Development on August 1, 2012.

The offers plaintiffs sent to Rural Development on May 18, which Rural Development later accepted, included Form Rural Development 3560-22, "Offer to Convey Security." The form stated:

> I. We hereby offer to convey to the United States of America, acting through the Rural Housing Service . . . our property covered by mortgages, deeds of trust, or other security instruments held or insured by the agency in full satisfaction of debt. . . .

> IV. At closing the following will be assigned to the Agency: . . . (4) all our rights, title, and interest in all contract rights, inventories, equipment, furnishings, accounts, general intangibles, gross receipts, gifts, pledges, income, and revenue as described in security instruments held or insured by the agency. . . .

> V. We agree to deliver possession of the property to the Agency when the conveyance to the Agency closes.

Def.'s App. 59.

On April 22, 2014, plaintiffs commenced this action for breach of contract, or, in the alternative, a taking in violation of the Fifth Amendment.

DISCUSSION

Plaintiffs pled a breach of contract claim based on the government's failure on the date its performance was due to permit plaintiffs to prepay their debt. In the alternative, plaintiffs pled a takings claim, asserting that, as of the date the government was required to accept prepayment but failed to do so, the government breached the prepayment right, thereby taking plaintiffs' real and intangible property interests. The government now moves for summary judgment on both claims. Defendant contends that plaintiffs lack standing to assert the breach of contract claim because when plaintiffs executed the deeds

in lieu of foreclosure for each property, they assigned the right to sue for breach of the prepayment right to the government, in effect extinguishing any potential breach of contract claims. With respect to the taking claims, defendant argues that, when a taking claim arises from the actions taken by the government contracting in its proprietary capacity, interference with plaintiffs' contract rights do not constitute a taking.

## I. BREACH OF CONTRACT CLAIM

We begin with plaintiffs' breach of contract claim. The government argues that plaintiffs assigned their right to sue for breach of contract by the plain language of the offer to convey security: "At closing the following will be assigned to the Agency: . . . (4) all our rights, title, and interest in all contract rights, inventories, equipment, furnishings, accounts, general intangibles, gross receipts, gifts, pledges, income, and revenue as described in security instruments held or insured by the agency." Def.'s App. 59. The government argues that the language used to convey the contract rights, "all our rights . . in all contract rights," was sufficient to assign the right to bring a claim for breach of contract, relying on *Dominion Res., Inc. v. United States*, 641 F.3d 1359, 1362-63 (Fed. Cir. 2011) (holding that the Nuclear Waste Policy Act's language, "the rights and duties of a party to a contract," permitted the assignment of a damages claim for breach). No particular language is necessary to effectively agree to assign one's rights under a contract, the government contends, as long as the language is sufficient to demonstrate that the parties intended to assign such rights. The government looks to the mortgage as the relevant security instrument, but reads the loan agreement, mortgage, and promissory note together as a single loan obligation. It argues that the mortgage describing the promissory note itself was sufficient to include the contract rights therein in the assignment.

Plaintiffs respond that the offer to convey security does not convey the breach of contract claim. Plaintiffs "intended to simply convey property ownership to the Government and to extinguish each mortgage debt." Pls.' Resp. Mot. Summ. J. 30. Plaintiffs argue that the government seeks to convert an assignment of assets into a release, despite the lack of release, waiver, or settlement language. They also argue that the only security instrument involved is the mortgage, and thus the prepayment right must be described in the mortgage itself. Reading the mortgage in isolation, plaintiffs contend that it does not describe the promissory note or the prepayment right contained in the

7

promissory note.

When interpreting contract language to determine the intent of the parties, we begin with the plain language. The contract must be read as a whole, giving meaning to all of its terms. *Alvin Ltd. v. U.S. Postal Serv.*, 816 F.2d 1562, 1565 (Fed. Cir. 1987). An assignment occurs when a party to a contract transfers a right to another, extinguishing the transferring party's right to performance. *See* Restatement (Second) of Contracts § 317(1) (Am. Law Inst. 1981). An assignment may be effective to transfer "the right to bring a claim for damages resulting from breach" of a contract, because the rights of a party to a contract "encompass not just the party's continuing rights and duties under the contract, but also the party's existing right to enforce the contract for an ongoing breach and to collect damages that have been incurred." *Dominion Res.*, 641 F.3d at 1363. An assignment does not require particular language, but the language used must be sufficient to demonstrate that the assignor intended to assign the right at issue to the assignee. *Id.*

The parties do not dispute that the prepayment clause in the promissory note is a contract right, as is plaintiffs' right to bring a claim for breach of the prepayment right. They dispute, however, whether the right to sue for breach is one of the contract rights that was effectively assigned to the government through the assignment clause in the offer to convey security. To decide what contract rights the assignment clause includes, we turn to a general principle: when multiple documents are executed contemporaneously and relate to the same transaction, those documents will be read together. *See Joy v. City of St. Louis*, 138 U.S. 1, 38 (1891) (Two agreements and a deed "constituted a single transaction, relating to the same subject-matter, and should be construed together in such a way as to carry into effect the intention of the parties, in view of their situation at the time and of the subject-matter of the instruments."); Restatement (Second) of Contracts § 202(2) (Am. Law Inst. 1981) ("[A]ll writings that are part of the same transaction are interpreted together."); *cf. CCA Assocs. v. United States*, 667 F.3d 1239, 1249-50 (Fed. Cir. 2011) (acknowledging that related documents are generally read together, but holding that the agreements were not sufficiently related when the documents were signed by distinct parties and HUD was a named party to only one of the agreements).

Here, all three documents were executed between the government and plaintiffs, were executed contemporaneously, and all relate to the same

8

concern: repayment of the Section 515 program loan. The mortgage expressly incorporates the terms of the loan agreement. The loan agreement recites that the note evidencing the loan, the loan agreement, and the security instrument together are a single loan obligation. The mortgage also provides that securing the payment of the note is the very purpose of executing the mortgage. The mortgage states that it is subject to the present and future regulations of the FmHA and those regulations provide that loans made under section 515 are to be repaid according to the provisions of the promissory note, loan agreement, and mortgage. 7 C.F.R. § 3560.401 (2017).

Plaintiffs are correct that the mortgage does not expressly reference the prepayment right, but the terms of repayment of a debt would naturally be located in a document evidencing the debt rather than in the document securing the debt. Plaintiffs also conclude that, because the terms surrounding "contract rights" in the offer to convey security all refer to a conveyance of secured property rather than rights associated with paying the debt, "contract rights" must only refer to property-related contract rights. Such a reading artificially restricts the ordinary meaning of "contract rights" and also neglects the fact that the agreement separately provides for the transfer of the properties and all the other rights plaintiff held relating to the properties.

Plaintiffs also contend that the contemporaneous circumstances support reading any contract rights located in the mortgage separately. Plaintiffs argue that they had no other viable financial option available other than to quickly rid themselves of the properties while retaining the right to sue for breach of contract later.[3] The government replies that, despite their financial hardship, plaintiffs had other legal options available than merely deeds in lieu of foreclosure. Those options included suing the government for breach of contract, defending against the foreclosure action, negotiating a different incentive package to remain in the program, or prepaying the loans which

---

[3] We do not find Lindsey Rupp's declaration that Mr. Rupp did not intend to assign the breach of contract claim to the government persuasive. Her husband's actions at the time the deeds in lieu of foreclosure were executed plainly demonstrate the contrary and the intent she attributed to him went unexpressed at the time.

plaintiffs had the right to do after the unsuccessful sale period.[4]

Plaintiffs may be correct that they were experiencing financial difficulties due to the limitations the Section 515 program placed on the properties since entering the loan program, prompting them to seek an expeditious exit from their entanglement in government financing. The particular circumstances motivating the assignments, however, do not vitiate their effect. The contemporaneous evidence demonstrates that plaintiffs sought a clean exit from the program, and that they did so without carving out the right to later bring a breach of contract claim.

We agree with the United States that the loan agreement, note, and mortgage were all of one piece. Due to the documents being executed as a single loan obligation between the government and plaintiffs and each containing contract rights, including the promissory note prepayment right, the reference to "all our rights . . . in all contract rights . . . described in the security instruments" clearly incorporates the contract rights set out in the note. By assigning all their contract rights to the government, the prepayment right was no longer enforceable by plaintiffs. Because the plain language of the offer to convey security read in light of the loan obligation and contemporaneous circumstances supports the conclusion that the breach of prepayment right claim was assigned to the government, we hold that plaintiffs lack standing now to bring the breach of contract claim and grant defendant's motion for summary judgment on the contract claim.

II.  TAKINGS CLAIM

---

[4] Plaintiffs also argue that Rural Development did not notify plaintiffs of permission to prepay after the ELIHPA requirements had been satisfied, as stated in the Rural Development handbook. Def.'s Suppl. App. 6. That lack of a notification, which was not required by ELIHPA, HCDA, the accompanying regulations, or the four loan obligations, did not prevent plaintiffs from pursuing prepayment, however. During the period after plaintiffs' request to prepay, Rural Development wrote to plaintiffs explaining that, if the properties did not sell, Rural Development may accept payment with no further restrictions. Pls.' Resp. Mot. to Dismiss Ex. I. The missing notification thus is not relevant to whether plaintiffs assigned their claim through the deeds in lieu of foreclosure.

In addition to the breach of contract claim, plaintiffs alternatively pled a takings claim. *See Stockton East Water Dist. v. United States*, 583 F.3d 1344, 1368 (Fed. Cir. 2009). Plaintiffs advance two theories of how the government took their property for public use without just compensation. Plaintiffs argue that the repudiation of the prepayment right itself constituted a taking of a contract right. Plaintiffs also assert, however, that the regulatory burden placed on the properties as a result of the refusal to allow prepayment in a timely manner constituted a taking of real property. They contend that the significant restrictions imposed by ELIHPA and HCDA forced plaintiffs to give up their property to the government.

Defendant argues that FmHA acted in the government's commercial or proprietary capacity in entering the contracts with plaintiffs and in repudiating the prepayment right. Thus, plaintiffs' remedies arise, if anywhere, from its contract rights. Defendant argues that plaintiffs "have not articulated a property-based taking that is distinct from the breach of contractual right." Def.'s Reply Mot. Summ. J. 13. Any "devastating impact" plaintiffs' properties experienced is indelibly tied to the "right rooted in plaintiffs' contracts." *Id.*

We agree. Regarding the alleged taking of the contractual prepayment right, plaintiffs cannot assert more contract rights in a takings claim than they possess in a breach of contract claim. As we explained above, plaintiffs effectively assigned the prepayment right to the government in the deeds in lieu of foreclosure, leaving no contract right to be asserted as a takings claim.

Furthermore, "when the government itself breaches a contract, a party must seek compensation from the government in contract rather than under a takings claim." *Piszel v. United States*, 833 F.3d 1366, 1376 (Fed. Cir. 2016) (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001) ("Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than its sovereign capacity. Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights.")). To cause the taking of a contractual right, the government most not only prevent performance of the contract, but also "must substantially take away the right to damages in the event of a breach." *Id.* at 1377. ELIHPA and HCDA prevented plaintiffs from exercising the unfettered right to prepay, but the government did not deprive plaintiffs of

the right to sue for breach of contract at the time the legislation was adopted or after plaintiffs' request to prepay. Plaintiffs were permitted to assert their contract rights in a claim until plaintiffs assigned those rights to the government in exchange for full satisfaction of their debt. The fact that plaintiffs chose to transfer the properties and associated contract rights to the government after they placed the government in breach does not create a taking.

Plaintiffs' regulatory taking theory also arises from breach of the prepayment right and the right to bring a claim for that breach, which was assigned to the government. Plaintiffs contend that ELIHPA and HCDA placed an additional regulatory burden on the properties by repudiating the unfettered right to prepay at the end of the 20-year restrictive use period, thus extending the properties' tenure in the Section 515 program. The additional regulatory burden, however, was the result of the government breaching plaintiffs' contractual right to prepay by failing to accept its prepayment request after the restricted use period had ended. Since both takings theories are tied to the breach of the contractual prepayment right, the takings claim for the contractual prepayment right and for the regulatory taking must fail. Thus, we grant summary judgment to the government on the takings claim.

CONCLUSION

Because plaintiffs lack standing to pursue the breach of contract claim and because the takings claim arises exclusively out of the contract rights that plaintiffs assigned, we grant defendant's motion for summary judgment. The Clerk is directed to enter judgment accordingly. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

12